Marie SHEPPARD, as surviving natural mother of the deceased Laura Sheppard, and for and on behalf of Marie Sheppard, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 81–1128 PCT EHC.

United States District Court, D. Arizona, Phoenix Division.

June 28, 1984.

Patrice M. Horstman, Hufford & Horstman, P.C., Flagstaff, Ariz., for plaintiff.

Richard G. Patrick, A. Melvin McDonald, U.S. Atty., Phoenix, Ariz., for defendant.

## MEMORANDUM AND ORDER

CARROLL, District Judge.

This action has been brought under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671, *et seq.*, (FTCA). Plaintiff Marie Sheppard (Mrs. Sheppard) seeks to establish that her daughter Laura Sheppard (Laura) is dead, and that claimed negligent actions of Bureau of Indian Affairs personnel proximately caused the death. Damages totaling $217,500 are sought under the Arizona Wrongful Death statute, A.R.S., § 12–613:

| | |
|---|---|
| Loss of Probability of Inheritance | $ 20,000 |
| Loss of Future Earnings | 40,000 |
| Loss of love, affection, companionship and service | $ 50,000 |
| Mental anguish, sorrow, pain and suffering | 100,000 |
| | $ 210,000 |

Approximately $3,500 is sought to cover monies or the value of property given to Navajo medicine men in connection with Laura's disappearance. $1,500 is requested for investigative expenses and $2,500 for expected funeral expenses.

The circumstances underlying this claim are unusual and tragic.

The Bureau of Indian Affairs (BIA) maintains facilities at Flagstaff, Arizona to house Indian students attending public schools in Flagstaff. These facilities include an administration building which houses a small gym and cafeteria, and separate buildings for boys and girls dormitories.

The students living in the dorms normally walk to and from school. Activities at the BIA complex are supervised and students are required to check-out when going in to town.

Overnight absences from the facility are subject to specific check-out requirements. Any student under 18 years of age can only check out for overnight (weekends) in the company of a person designated for that purpose by a parent.

Laura, a member of the Navajo Tribe, was born January 29, 1961. She resided in the BIA dorm for the years 1976–77 (8th grade) and 1977–78 (9th grade).

Laura returned to the BIA facility in late August, 1978 to attend Flagstaff High School for the 1978–79 school year. Although parents are encouraged to be with a child when registering at the BIA dorm, Mrs. Sheppard, a widow, did not accompany Laura for this purpose. Laura was dropped off by a sister, who did not remain to assist in registering Laura into the dorm.

Laura's registration card for her enrollment on August 23, 1976, properly reflected her date of birth and age as 15. The registration card for the next school year had the right birth date, but incorrectly showed her age as 17. This error was carried forward when she enrolled at the dormitory on August 27, 1978, i.e., her age was noted as 18.[1]

Mrs. Sheppard never designated anyone to sign Laura out overnight during the time she resided at the dorm.

Now, to the events leading up to Laura's checking herself out of the dorm at approximately 5 p.m., Friday, October 13, 1978, and her subsequent disappearance.

Several girls in the dorm were interested in home visits the weekend of October 6. Laura wanted to go home and she asked whether she could go with the group. She talked with James Kimery, a Guidance Supervisor, who told her there were no aides available to take students to their homes on the reservation.

An Education Aide at the dormitory, Avis Cassidy, nee Hudson, testified that Kimery asked Laura her age and she said she was 17; that Kimery then looked at the enrollment card and said, no, you are 18; Laura then replied, yeah, I'm 18. The aide said she didn't correct Kimery, although she knew Laura was only 17. Ms. Cassidy went on to testify that Kimery told Laura and the dorm aides that Laura could check herself out the next weekend.

Kimery testified he recalled some discussion with Laura the weekend prior to her disappearance, but he denies saying Laura was 18, or giving permission for her to check herself out the next weekend. Resolution of this conflict between the testimony of Cassidy and Kimery is not determinative in this case. However, I find that Ms. Cassidy was a hostile witness to the BIA. She tended to forget matters ostensibly adverse to plaintiff, while trying to put the BIA in the worst light whenever possible.

It is undisputed that Laura was allowed to check herself out for what was stated to be a weekend home visitation on October 13, 1978, and that Ms. Cassidy, if no other, allowed her to do so knowing that she was not 18 years of age.

The record clearly shows that Laura did not intend to go home when she left the BIA dorm late in the afternoon of October 13. She had spoken to her sister Lori on October 10 and she told her she wanted to attend the Navajo Tribal Fair in Tuba City that weekend and asked her sister for assistance in getting there. Laura had written a letter to her sister Lou Ann, who lived in Tuba City, about the Fair. Although this letter, which was not mailed, is dated Sept. 8th, I find that it was written October 8:

Dear Lou Ann,

Howdy there, how's everything coming alone for you in T.C.? Me everything is all screw up for me, so All I'm trying to

---

1. At some time, the typed 18 was crossed out and 17 written in. This apparently occurred after October 13, 1978.

do is getting away from it. So their's Tuba Fair coming up next week, and I want to go. And I'll be over there Fri, at the boarding school, because now I can check myself out, and have fun a little. But sure don't know where to spent the nite, but I'll think of something good And I'm not planning to go home or anything. That's all I wanted to tell you. Bye, Bye have fun and don't get in trouble.

A sis, and a friend,
Laura

On October 14, Kimery asked Ms. Cassidy to advise him when Laura returned, inasmuch as he wanted to discuss an incident with her where she had been written up by Ms. Cassidy on October 9 for alleged intoxication the evening of October 8, 1978. Laura had been away from the dorm that afternoon with her brother Jonathan and two of his friends.

Laura's absence was noted at the dormitory when she failed to return on Sunday, October 15. She continued to be considered on home leave, rather than A.W. O.L., until her family came to visit her on October 28, and discovered that she had not been at the dormitory since October 13.

Laura's family went to the Navajo Police Station in Tuba City on October 29 to report her missing. Laura's clothing and wallet were given to the family at that time.

## IS LAURA SHEPPARD DEAD?

■ Laura has not contacted her family after she left the BIA Dormitory the afternoon of October 13, 1978. This lack of contact is inconsistent with Laura's prior conduct and supports the plaintiff's claim that Laura is dead.

Although there have been a few occasions where someone claimed to see a person believed to be Laura in Flagstaff, Phoenix, Los Angeles, etc., subsequent investigations failed to disclose her presence there.

Laura's blood-stained clothing and billfold were found in a desolate area approximately seven miles from Tuba City, around mid-day on October 14, 1978. These items were turned over to the Navajo Police in Tuba City on or about October 22, 1978. The police appear to have made a cursory inspection of the area at that time.

Subsequent investigation by the police was belated, poorly organized and documented, and has probably resulted in the person or persons responsible for Laura's death escaping prosecution.

The police learned that on the evening of October 13, 1978 two Navajo males from Many Farms were visiting the family who reported finding Laura's clothing. The Pretrial Order stipulates that these two persons were interviewed (date unspecified) and that they "admitted to being with a young female named Laura Sheppard on the evening of October 13, 1978, or morning of October 15, 1978" and that "they saw her running semi-nude out into the Moenave Mesa."

Following a subsequent polygraph test on May 5, 1982, one of these persons confessed that he and his companion assaulted and raped Laura. He also drew a map showing where they had buried her body. The statement did not relate the circumstances of her death. The Moenave area was searched extensively at this time, but her body was not found.

There is a presumption of death under Arizona Revised Statutes, Section 12–509, which is applicable under the facts of this case:

> A person absenting himself from the place of his last domicile for five years successively shall be presumed dead in any action wherein his death comes into question, unless proof is made that he was alive within that time.

There is no credible evidence that Laura Sheppard was alive after October 14, 1978. The government does not really contend to the contrary.

I find that Laura Sheppard died on or about October 14, 1978.

## IS THE UNITED STATES LIABLE IN DAMAGES TO MARIE SHEPPARD FOR THE DEATH OF HER DAUGHTER?

■ The Government argues that it is not liable to Mrs. Sheppard through its

action in allowing Laura to check herself out of the dormitory, relying on the Arizona Court of Appeals opinion in *Chavez v. Tolleson Elementary School District*, 122 Ariz. 472, 595 P.2d 1017. (Ct.App.1979)

In *Chavez*, a puppy wandered into a classroom. Regina Chavez, a ten year old student, said it lived in her neighborhood. She was sent to the principal's office to see if she could get permission to take it home. There, she was told to leave the dog outside and to return to her classroom. She did not return to the classroom and disappeared. Her body was found three months later in a field a few miles from the school. Someone subsequently confessed to abducting her outside the school grounds about 10:30 a.m., and later killing her.

The Court of Appeals' decision in *Chavez* reversed a jury verdict in favor of the child's parents and against the School District. The Court discussed duty, negligence and proximate cause as three separate but interrelated issues. The Court noted:

> Duty in a given situation is commensurate with the dangers involved ... It is the *unreasonable* risk of harm which subjects the action to liability ... Forseeability is not only involved in the determination of proximate cause, it is also one of the yardsticks by which the duty is measured. (Citations omitted)

*Id.*, 122 Ariz. at 476, 595 P.2d at 1021.

The *Chavez* Court then held:

> There are no facts in the record indicating that school personnel should have been aware of the potential of criminal conduct in the area of Tolleson Elementary School, Unit Two. To say that murder is a forseeable potential creating an unreasonable risk of harm to each child leaving school grounds each day in the state of Arizona is untenable. The heinous criminal conduct involved here, while shocking, is clearly in the category of the unforseeable. If it were otherwise, prevision would become paranoia and the routines of daily life would be burdened by intolerable fear and inaction. The intervention of the criminal conduct was foreign to any risk created

by the school personnel. As a matter of law, we hold that the defendants could not reasonably have foreseen that Regina Chavez would leave the school grounds without permission and thereafter be abducted and slain.

*Id.*, 122 Ariz. at 477–78, 595 P.2d at 1023.

Absent some distinguishing circumstances in the case at issue, the law as determined in the *Chavez* case is binding precedent which must be followed. The fact that a different result might arguably obtain in another jurisdiction is not decisive. *Cf. Hoyem v. Manhattan Beach City School Dist.*, 150 Cal.Rptr. 1, 585 P.2d 851 (1978); *Bryant v. United States*, 565 F.2d 650 (10th Cir.1977).

The facts in this case do not support a claim for Laura's death under A.R.S., Section 12–611:

> When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter.

The harm which befell Laura was the product of felonious criminal conduct. That conduct was an intervening cause of such an extraordinary character that it could not have been reasonably anticipated to occur.

The Court in *Central Alarm of Tucson v. Ganem*, 116 Ariz. 74, 76–77, 567 P.2d 1203, 1205–06, (Ct.App.1977) recognized that "independent criminal acts of a third person under certain circumstances need not be superseding causes." The Court stated:

> ... the crucial question in each instance is the forseeability of illegal conduct or the concurrence of the original

negligent conduct with the illegal intervening acts of the third person...

*Id.*

Assuming arguendo that the illegal intervening acts of the two persons were foreseeable, or that some trust obligation existed due to Laura's status as an Indian, is the defense of contributory negligence available to the Government?

I find that the facts of this case present the issue of Laura's contributory negligence for resolution.

Laura was aware of the 18 year old check-out rule when she signed herself out of the dormitory on October 13, 1978.

Laura's knowing and deliberate action in checking herself out of the dorm, in violation of the dorm's rules, would bar her from recovery. It likewise bars her mother's claim under the Arizona wrongful death statute. Her actions must be judged in reference to her age, intelligence and experience. *Ruiz v. Faulkner*, 12 Ariz. App. 352, 355, 470 P.2d 500, 503 (1970). Laura was just three and one-half months short of her 18th birthday; she was aware of the school regulations; she wanted to get away from the dorm and to have a good time—she particularly wanted to go to the Tuba City Fair, although her sister refused to help her get there and she had no place to stay.

Laura's last letters to a friend and her sisters reflect an unhappiness with her general situation on the reservation and a return to the discipline and confinement of the BIA dormitory for another school year. She wished for time alone with her sisters; she thought of running away; she anticipated (or fantasized) a romantic relationship. No one will ever know the extent to which these, or similar concerns, contributed to Laura's determination to check herself out of the dorm on October 13, 1978 to attend the Tuba City Fair. The consequence of that decision is resolved by this order; the responsibility for that decision must be shared by Laura, and through her, by her mother.[2]

2. Count III, in the complaint, claimed that the Government's actions (or omissions) violated the Navajo Treaty of 1868. This contention was

The foregoing opinion in its entirety constitutes the Court's findings of fact and conclusions of law.

Accordingly, IT IS ORDERED that judgment be entered for the Defendant and against the Plaintiff, and that Plaintiff take nothing by the complaint.

withdrawn in Plaintiff's Supplemental Memorandum filed May 7, 1984.